JAMMIES INTERNATIONAL,
INC., Plaintiff,

v.

Charles LAZARUS and Toys "R" Us,
Inc., Defendants.

No. 88 Civ. 0954 (MGC).

United States District Court,
S.D. New York.

May 5, 1989.

Levy & Levy, New York City, by Morris J. Levy, for plaintiff.

Shea & Gould, New York City, by Martin Shelton and David G. Ebert, for defendant Charles Lazarus; Lepatner, Gainen & Block, New York City, by Robert A. Banner, for defendant Toys "R" Us, Inc.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

CEDARBAUM, District Judge.

This is an action brought under section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), to recover "short-swing profits" allegedly realized by defendant Charles Lazarus from his wife's sales and his purchase of common stock of Toys "R" Us, Inc. A one-day bench trial was held on May 1, 1989. Two witnesses testified in court. Plaintiff called Dr. Helen S. Kaplan Lazarus as a witness. Defendant Charles Lazarus was a defense witness. After observing the demeanor of the witnesses and evaluating the plausibility and credibility of their testimony, and after examining the documentary evidence introduced at trial, I make the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

FINDINGS OF FACT

First, I adopt the facts to which the parties have expressly agreed:

1. Defendant Toys "R" Us, Inc. ("Toys") is a corporation duly organized and existing under the laws of the State of Delaware.

2. At all times relevant to this action, Toys' equity securities were duly registered with, and listed on, the New York Stock Exchange, a national securities exchange, and were not exempted securities.

3. Defendant Charles Lazarus ("Lazarus") is and has been since 1978 Chairman of the Board, a Director and Chief Executive Officer of Toys.

4. Lazarus and Dr. Helen S. Kaplan Lazarus ("Kaplan") are husband and wife. Lazarus and Kaplan were married on November 2, 1979.

5. During the month of June 1987 Kaplan sold from her own account shares of Toys' common stock, as follows:

| Date | No. Shs. Sold | Price Per Share | Net Proceeds of Sale |
|---|---|---|---|
| 6/5/87 | 5,000 | $35½ | $176,407.06 |
| 6/5/87 | 5,000 | 35 | 173,907.16 |
| 6/8/87 | 5,000 | 34⅞ | 173,284.14 |
| 6/8/87 | 4,000 | 34½ | 137,127.40 |
| TOTAL—19,000 Shares | | TOTAL NET PROCEEDS—$660,725.76 | |

6. On October 5, 1987 Lazarus exercised his stock option for 1,442,706 shares of Toys' common stock at $.96 per share which had been granted to him pursuant to his 1978 Employment Agreement with Toys. Lazarus made full payment for such shares in accordance with the provisions of the Employment Agreement by delivering his check payable to Toys in the amount of $276,997.76 and by delivering his promissory note payable to Toys in the amount of $1,108,000.00.

7. Lazarus registered the Toys' shares that he purchased on October 5, 1987 in his name.

8. On November 12, 1987, the attorneys for plaintiff, Jammies International, Inc. ("Jammys"), sent a letter to Toys requesting Toys to institute suit to recover the profits purported to have been realized from the alleged short-swing transactions in its securities. Toys did not institute an action and 60 days have elapsed since Jammys made its request.

9. Lazarus and Kaplan have filed joint federal income tax returns for each year of their marriage. Lazarus and Kaplan filed joint New York State income tax returns in the years 1979, 1980, 1981, 1982, 1984 and 1987.

10. Ernst & Whinney, an accounting firm, prepared the joint federal and New York State income tax returns for Kaplan and Lazarus for at least the years 1986 and 1987.

11. The deductions for married couples when each works were taken in their joint federal income tax returns for the years 1983 through 1986.

12. The amount of the working couple deduction taken by Kaplan and Lazarus in their joint New York State income tax return for 1987 amounted to the sum of $3,000.

13. The respective investment tax credits taken by Kaplan and Lazarus in their joint federal tax returns for the years 1979 through 1985 were as follows:

| 1979 | – | $ 36 |
|------|---|------|
| 1980 | – | 487 |
| 1981 | – | 13,647 |
| 1982 | – | 1,920 |
| 1983 | – | 1,204 |
| 1984 | – | 920 |
| 1985 | – | 1,417 |

14. Deductions for Kaplan's professional office are taken through her professional corporation only.

15. Lazarus and Kaplan presently maintain their residence at 960 Fifth Avenue, New York City.

16. Lazarus has made gifts to Kaplan's children of approximately 25 or 50 shares of Toys' stock.

17. Kaplan has a retirement fund.

In addition, I find the following facts:

18. Jammys is a Florida corporation with its principal place of business in West Palm Beach, Florida.

19. In 1987, an Amendment to the Certificate of Incorporation was filed changing the spelling of the corporation's name from "Jammies" International, Inc. to "Jammys" International, Inc.

20. On November 11, 1987, Jammys purchased one share of the common stock of Toys.

21. Jammys is and has been the beneficial owner of one share of common stock of Toys since November 11, 1987.

22. Kaplan is a psychiatrist who specializes in sexual problems. She has M.D., M.A., and Ph.D. degrees, and is board certified in psychiatry. Her writings in her field have been published.

23. Since 1970, she has had a private practice in psychiatry and has been a part-time faculty member at New York Hospital.

24. The marriage between Lazarus and Kaplan was a second marriage for both of them.

25. Kaplan has three children from her prior marriage, and Lazarus has two children from his prior marriage. Kaplan and Lazarus have not had any children during their marriage to each other.

26. Prior to her marriage to Lazarus, Kaplan owned the apartment in which she

lived as well as a house at Red Cedar Point in the Hamptons.

27. Lazarus and Kaplan entered into a prenuptial agreement in which Lazarus gave up all rights to Kaplan's estate.

28. In the early period of their marriage, the couple lived in Kaplan's apartment and country house.

29. In the early period of their marriage, Kaplan paid a larger share of the household expenses than did her husband.

30. As Lazarus' income increased, he gradually paid more of their joint household expenses.

31. Lazarus always paid for their vacations.

32. Sometime during 1984 or 1985, Kaplan sold her apartment and country house in which they had lived since their marriage.

33. Kaplan deposited the proceeds of these sales in a bank money market account in her own name.

34. During the same period, Lazarus purchased an apartment into which the couple moved. He also bought two country houses, one in Quogue, the other at Nassau in the Bahamas.

35. Lazarus paid for the purchase and renovation of these three residences which are owned jointly by the couple.

36. Since that time, Lazarus has paid for all of the household expenses and all of Kaplan's clothing. Lazarus has also given Kaplan a Mercedes Benz convertible automobile. In Kaplan's words: "Since Charles has made a great deal of money, he has kept his money separate."

37. The only joint account maintained in the name of both Kaplan and Lazarus is a joint checking account into which funds are deposited only by Lazarus for use by Kaplan in paying household expenses.

38. Kaplan has organized a professional corporation from which she draws a salary.

39. Apart from contributions to her professional retirement fund, Kaplan puts most of her earnings into her bank money market account, investments and gifts to her children.

40. Kaplan, who loves gardening, has an ongoing program of purchasing trees and bushes for the Quogue house. To date, she has spent approximately $170,000 for such landscaping costs.

41. Kaplan also uses her earnings for the purchase of works of art.

42. During the period of the couple's courtship, Kaplan bought about 5,000 shares of Toys. After the marriage, she purchased additional shares.

43. Immediately prior to her sales of 19,000 shares in June of 1987, Kaplan owned 44,000 shares of Toys' stock.

44. Kaplan has used only her own funds—her professional earnings and the earnings from her personal investments—to buy all of the securities held in her name, including her shares of Toys' stock.

45. There have not been any cash dividends on Toys' stock.

46. Kaplan does not have a financial advisor for the investment of her personal funds, although she does have a financial advisor who manages her professional retirement fund.

47. For her personal funds, Kaplan makes her own investment decisions, but she does solicit Lazarus' advice when she can get his attention because she considers him a brilliant business man.

48. When they do discuss her investments, they do not discuss them in depth because Lazarus is hesitant to give Kaplan financial advice.

49. Before each purchase of Toys' stock, Kaplan discussed the purchase with Lazarus.

50. Every year, Lazarus has discussed the matter with Kaplan before exercising his stock options in Toys.

51. Several days prior to her sales of the 19,000 shares, Kaplan discussed the planned transactions with Lazarus.

52. Lazarus always opposed the sale of Toys' stock.

53. Lazarus did not like anyone connected with Toys to buy or sell stock in the fourth quarter of the year when profit is taken, and Kaplan knew that it was "not O.K." to

buy or sell Toys' stock between November 1 and January 31.

54. Lazarus said that "it was O.K. with him although he did not think it was a good idea from a financial point of view."

55. Kaplan understood Lazarus' comment to mean that there were no legal or technical impediments to her selling the 19,000 shares, but that he was not in favor of the sale from a financial point of view.

56. Kaplan wanted to sell her Toys' stock because the building in which she had rented her professional office for many years was converted into condominiums. She wanted to purchase a large condominium in that building for the price of $1.1 million. She used all of the proceeds of the sale of her Toys' stock toward the purchase of space for her professional practice.

57. During the early part of their marriage (approximately the first one and one-half to two years), Kaplan and Lazarus shared the same investment advisor.

58. Since that time, Kaplan and Lazarus have independently invested in a few of the same investments, including tax shelters.

59. Kaplan and Lazarus independently gave some business to Ernie Cascioli, a stockbroker who was a friend of Kaplan's son.

60. Kaplan has always paid her share of the couple's taxes with her own funds.

61. Kaplan and Lazarus have not purchased jointly or held jointly any securities.

62. Kaplan and Lazarus have not invested jointly in any partnerships.

63. Last year, Kaplan and Lazarus invested different amounts in the same limited partnership. At the time, Lazarus was unaware of Kaplan's investment.

64. Lazarus and Kaplan do not have a joint safe deposit box.

65. Lazarus and Kaplan do not engage in joint estate planning.

66. Neither Lazarus nor Kaplan has ever loaned money to the other.

67. Kaplan has signed proxies in favor of Lazarus and sent them to Toys.

68. Neither Lazarus nor Kaplan has ever used the other's gift tax exclusion.

69. Lazarus and Kaplan have never filed a joint gift tax return.

70. In five filings of Form 4 with the Securities and Exchange Commission, Lazarus reported Kaplan's holdings of Toys' stock and disclaimed ownership of her shares.

71. The lowest market price for Toys' stock within six months of June 5, 1987 and June 8, 1987 was $22 per share.

## DISCUSSION AND CONCLUSIONS OF LAW

Jurisdiction of this action is based on sections 16(b) and 27 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78p(b), 78aa.

Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), as here relevant provides:

> (b) For the purpose of preventing the unfair use of information which may have been obtained by [a more than 10%] beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer ... within any period of less than six months ... shall inure to and be recoverable by the issuer....

Even though Jammys purchased its stock after the transaction complained of, courts have uniformly held that the plaintiff need not have been a shareholder at the time of the transaction which gave rise to the suit. *See Blau v. Oppenheim*, 250 F.Supp. 881, 883 (S.D.N.Y.1966).

Although the intimacy and shared interest of the marital relationship provides both the temptation and the opportunity for the exchange of inside information, the courts have not adopted the *per se* rule that the SEC is currently proposing. *See* 53 Fed.Reg. 50,002 (proposed Dec. 13, 1988). Nevertheless, it is clear that a corporate officer and director may be held to have "realized profit" within the meaning of section 16(b) as a result of a matching of

his wife's sales and his own purchase of his company's securities within the statutory six month period. *Whiting v. Dow Chemical Company,* 523 F.2d 680, 681–82 (2d Cir.1975); *see also Blau v. Potter,* Fed.Sec. L.Rep. (CCH) ¶ 94,115 (S.D.N.Y. Jan. 18, 1973). But the legal standard that does apply in determining when such a holding is appropriate is not clear. In the governing opinion in this Circuit, and indeed in the only appellate opinion on the matching of a spouse's sales with the other spouse's purchase of securities under section 16(b), the Second Circuit concluded that this is "a situation that cannot be resolved by legal interpretation but which requires a determination of questions of fact." *Whiting,* 523 F.2d at 687. In order to extract the teaching of *Whiting,* it is necessary to examine both the facts emphasized by the Second Circuit, and the Court's reason for attributing significance to those facts.

One of the premises on which the Second Circuit examined the facts in that case was that "shares to which legal title is held by one spouse may be said to be 'beneficially owned' by the other, the insider, if the ordinary rewards of ownership are used for their joint benefit." *Id.* at 688. The facts of *Whiting* establish that in order to attribute ownership to the insider, it is not necessary that the proceeds of the other spouse's particular sales be traceable to household or family support since money is fungible. But there must be some benefit, however indirect, to the insider from the ownership of the securities by the other spouse. In the *Whiting* case, that common benefit was shown by the fact that the larger part of the common maintenance of the couple's household came from the wife's personal inheritance which consisted primarily of shares of the insider's company. Mrs. Whiting also lent her husband the money needed for his purchase of shares.

In this case, it cannot fairly be said that after 1984 or 1985 Lazarus received any benefit from Kaplan's ownership of the 19,000 shares of Toys' stock that she sold in June of 1987. Kaplan contributed nothing to Lazarus' support, except that she purchased the landscaping for their Quo-

gue house and some works of art. As a family unit, Kaplan and Lazarus share only Lazarus' property. Kaplan's independently-acquired property has been kept entirely separate, and Lazarus, pursuant to a prenuptial agreement, has given up all rights to Kaplan's separate property.

I turn then to the question of control. As I read *Whiting,* even in the absence of contributions of household funds by the other spouse, the exercise of control by the insider over the other spouse's investment decisions would justify treating the insider as the owner of the other spouse's securities for purposes of section 16(b). This is because one of the important attributes of ownership is the ability to control the disposition of the property owned. *Whiting* establishes that exclusive control is not necessary. *Id.* at 688–89. Shared control is sufficient. In *Whiting,* the insider shared control of his wife's property through their joint financial planning. For financial planning purposes, their joint advisors treated their separate accounts as a common fund. Both spouses participated in joint planning sessions for the investment and disposition of each other's property as if the property of each was the property of both.

In this case, the credible evidence shows that Lazarus did not share control of Kaplan's investment decisions. Although Kaplan solicited Lazarus' advice in connection with her investment decisions, he was hesitant to give her financial advice. Several days prior to her sales, Kaplan discussed with Lazarus her plan to sell 19,000 shares of Toys' stock. But she did not follow his advice. Lazarus told Kaplan that "it was O.K. with him although he did not think it was a good idea from a financial point of view." Kaplan understood Lazarus' comment to mean that there were no legal or technical impediments to her selling the 19,000 shares, but that he was not in favor of the sale from a financial point of view. Even though Lazarus did not favor Kaplan's decision to sell the shares, Kaplan followed her own plan. Thus, the evidence negates that Lazarus shared control of the 19,000 shares of Toys' stock owned by Kaplan.

For the reasons discussed above, I conclude that Lazarus was not the beneficial owner of Kaplan's 19,000 shares of Toys' stock. Thus, Lazarus' purchase of Toys' stock should not be matched with Kaplan's sales, and Lazarus has not realized any profit within the meaning of section 16(b). Judgment is entered for defendants and against plaintiff on the claim in this action.

SO ORDERED.